# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SUSAN RAINWATER,<br><br>       *Plaintiff*,<br><br>  v.<br><br>BOARD OF REGENTS FOR THE UNIVERSITY OF OKLAHOMA; STATE OF OKLAHOMA ex rel. UNIVERSITY OF OKLAHOMA, JASON SANDERS, individually and in his official capacity as the Senior Vice President and Provost of the University of Oklahoma Health Sciences Center, CHRISTINA BENNETT, individually and in her official capacity as former Director of the University of Oklahoma Master's in Health Administration Program, DAVID JOHNSON, individually and in his official capacity as Associate Dean for Academic Affairs of the University of Oklahoma College of Public Health, and EDWIN IBAY, in his official capacity as current Director of the University of Oklahoma Master's in Health Administration Program Director,<br><br>       *Defendants*. | Civil Action No. CIV-19-382-R<br>_____<br><br>**COMPLAINT**<br>**(Jury Demanded)**<br>**Attorney's Lien Claimed** |

COMES NOW, Plaintiff SUSAN RAINWATER ("Plaintiff" or "Dr. Rainwater"), by and through her undersigned counsel, and hereby complains and alleges against the above-named Defendants, based upon knowledge, information and a reasonable belief derived therefrom, as follows:

## INTRODUCTION

Dr. Rainwater seeks relief to remedy violations of the Americans with Disabilities Act, and the Rehabilitation Act of 1973, and violations of her substantive due process rights secured

by the Fourteenth Amendment of the United States Constitution by Defendants BOARD OF REGENTS FOR THE UNIVERSITY OF OKLAHOMA; STATE OF OKLAHOMA ex rel. UNIVERSITY OF OKLAHOMA (collectively, "OU"), JASON SANDERS, CHRISTINA BENNETT, DAVID JOHNSON, and EDWIN IBAY (with OU, collectively the "Defendants"). Dr. Rainwater informed Defendants of her disability and requested reasonable accommodations. Defendants denied those accommodations and failed to engage in any discussions about necessary accommodations or available supports.   Instead, Defendants directed targeted harassment and hostility towards Dr. Rainwater and penalized her for the effects of her disability that resulted from Defendants' failure to provide required accommodations.

Defendants then ensured that Dr. Rainwater would be dismissed from the Master's in Health Administration program, despite her ability to complete all academic requirements with appropriate accommodations, by awarding an arbitrary grade based in large part on the refusal to provide accommodations, and then dismissing her for that grade before she had a chance to appeal.   Defendants further summarily denied her appeal of the dismissal, without providing the hearing required by policy.   Accordingly, she now petitions this Court for redress in the form of injunctive relief, damages, costs and reasonable attorney's fees in relation to the violation of her rights, as well as damages for tortious interference with her contract with OU pursuant to Oklahoma common law.

## PARTIES

1.     Plaintiff Susan Rainwater is currently a resident of the State of Florida and, at all relevant times, was a student in the Master's in Health Administration ("MHA") program in OU's College of Public Health, housed in OU's Health Sciences Center.

2.      Defendant University of Oklahoma is located in and a citizen of Norman, Oklahoma.  OU's Health Sciences Center, College of Public Health, houses the Master's in Health Administration Program, which is located on OU's Oklahoma City, Oklahoma campus.

3.      Defendant Christina Bennett is a resident of Oklahoma and was at all relevant times an Assistant Professor in and the Director of OU's Master's in Health Administration program.  Ms. Bennett is being sued in her individual and official capacity.

4.      Defendant Jason Sanders is a resident of Oklahoma and is OU's Health Sciences Center's Senior Vice President and Provost.  Dr. Sanders is being sued in his individual and official capacity.

5.      Defendant David Johnson is the Associate Dean for Academic Affairs of the OU College of Public Health.  Dr. Johnson is being sued in his individual and official capacity.

6.      Defendant Edwin Ibay is the current Director of OU's MHA program.  Dr. Ibay is being sued in his official capacity.

7.      At all times relevant hereto, and in all their actions described herein, Defendants' actions took place in Norman or Oklahoma City, Oklahoma.

## VENUE & JURISDICTION

8.      Subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1332 (diversity of citizens) because the amount in controversy exceeds $75,000.00, and the parties are diverse and 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights), as there exist claims based upon 42 U.S.C. §§ 12101, *et seq.,* and 29 U.S.C. § 701, *et seq.*

9.      Supplemental jurisdiction over Plaintiff's pendant state law claims is proper pursuant to 28 U.S.C. § 1367(a), as there exist claims arising out of the same transaction and occurrence as her federal claims.

10.     Venue is proper in the Western District of Oklahoma pursuant to 28 U.S.C. § 1391(b) in that the claims arose in this district, and Defendants are located in this district.

11.     Costs and attorney's fees are sought.

## GENERAL FACTUAL ALLEGATIONS

12.     Dr. Rainwater previously graduated from the University of Oklahoma with her Bachelor's in Microbiology and from OU College of Medicine with her M.D.  She is a licensed physician in four states and is board eligible.

13.     Following more than a decade of success as an anesthesiologist, Dr. Rainwater decided that a career in health administration would permit her to build on her experience as a physician and expand her career opportunities.  In pursuit of this, she left medical practice to attend the OU's MHA program, entering in the Fall 2014 term.

14.     As a MHA student, Dr. Rainwater experienced substantial success earning a number of As in her courses.  This success occurred despite the impact of a chronic and serious medical condition, about which Dr. Rainwater informed OU, and the impact of which was reflected in a few grades of C.   Her success continued until Professor Bennett's professional communication class in Spring 2016.

15.     As the program director for the MHA program, Professor Bennett interacted with most MHA students and select other students had experienced substantial difficulty in their dealings with her.  Professor Bennett's history of targeting certain students through arbitrarily harsh actions, grading and treatment was well known.

16.     Prior to attending the MHA program, Dr. Rainwater had successfully completed the whole of medical school, residency, and 14 years of medical practice, thus more than demonstrating her ability to meet the academic demands of a master's program.  In the MHA

program, Dr. Rainwater's capabilities were reflected in her grades of As and Bs, and her successful completion of other courses despite her medical condition.

17.     Yet, in Professor Bennett's class, Dr. Rainwater suddenly was judged to produce failing work.

18.     Dr. Rainwater's grade was based in part on Professor Bennett's failure to make a requested minor adjustment and accommodation due to Dr. Rainwater's medical condition.

19.     In April 2016, Dr. Rainwater found herself unable to attend a class due to her condition, and in need of surgery within a few weeks.  Dr. Rainwater immediately informed Professor Bennett of her inability to attend class due to her condition and her need for two additional days to turn in a paper for the class.

20.     Dr. Rainwater also asked Professor Bennett if she had any advice and what else she would need to do as a result of her health condition and need for adjustments.

21.     All that Dr. Rainwater received in response was a hostile and dismissive attitude towards her health issues.  When Dr. Rainwater ultimately submitted her paper, Professor Bennett responded saying, "What am I supposed to do with this?"

22.     As a result of Professor Bennett's refusal to make necessary and reasonable accommodations, and despite attending class and completing all other course requirements in line with the criteria provided by Professor Bennett, Dr. Rainwater received a grade of "F" in the class.

23.     In addition to disclosing her medical condition and related need for accommodations to OU, via Professor Bennett, Dr. Rainwater also had extensive discussions about her disability in May and June 2016 with Dr. Andrea Lorden, Assistant Professor in the MHA program and Dr. Rainwater's advisor.

24.     Neither Professor Bennett nor Dr. Lorden suggested that any other steps were necessary to receive accommodations or directed her to other avenues of support – instead, Dr. Rainwater was simply denied these accommodations.

25.     Because of Professor Bennett's discriminatory refusal to provide accommodations and resulting grade, Dr. Rainwater was required to meet with the Academic Committee to discuss her standing in the MHA program.

26.     During that meeting, despite Dr. Rainwater's success elsewhere in the program, Professor Bennett sought to use her power as the MHA program director and urged the committee to dismiss her.  When she was unsuccessful, Professor Bennett then sought to have the committee place restrictive probation conditions on Dr. Rainwater such as forcing Dr. Rainwater to take only graded classes, despite the program's inclusion of ungraded electives and knowing of Dr. Rainwater's need for accommodations, including potential scheduling accommodations.

27.     The committee did not consider Dr. Rainwater's disability or the refusal to provide her with requested accommodations.  However, no other committee member believed dismissal was appropriate and the committee recommended she continue in the program on academic probation and be required to retake the professional communications course when it was offered again in Spring 2017.

28.     Following the committee meeting, Dr. Rainwater's advisor initially told her she had to obtain three As to meet the requirements of her probation.

29.     Then, her advisor told her she only needed to earn all Bs or above to fulfill the conditions.  She was also told that she was required to bring her GPA up to a 3.0; however, no timeframe for bringing up her GPA was given.

30.     That summer, Dr. Rainwater required serious abdominal surgery and a four-day hospitalization for her medical condition.

31.     After learning this, Dr. Rainwater's advisor suggested only that she take a semester off.  No other suggestions for accommodations or modifications were made.

32.     Not wanting to derail her studies and unaware of other options, Dr. Rainwater declined to take a semester off and instead returned full time to her studies after only five weeks.

33.     Dr. Rainwater continued in the program in Fall 2016, without accommodations, redoubling her efforts to ensure that her grades showed her capabilities.

34.     One of her fall classes was a three credit Leadership for Health Professionals course.  The class syllabus indicated that the course would be graded on a letter grade basis, and Dr. Rainwater earned an A.  However, after the class had finished, Dr. Rainwater's advisor notified her that her grade would not count for her GPA – and thus her efforts to meet the conditions of academic probation – and was instead pass/fail.

35.     In Spring 2017, Dr. Rainwater retook the professional communication course, still taught by Professor Bennett.  At this point, OU still had not provided Dr. Rainwater with any accommodations.

36.     At the same time that Dr. Rainwater was retaking the communication course, she completed the Seminar in Health Administration, the MHA program's capstone course meant to be an evaluation of all necessary skills and competencies required for program graduation.  In line with all prior performances, except Professor Bennett's grade, Dr. Rainwater successfully completed the Seminar in Health Administration with a grade of B, indicating mastery of the skills required to earn an MHA.

37.     Dr. Rainwater's second experience with Professor Bennett proved no better than the first.   Again, Dr. Rainwater attended every class, save for one discussed below, and completed every assignment.  She made the changes to assignments recommended by Professor Bennett, and produced the final culminating project demonstrating her compliance with all course requirements, and performance of required skills.

38.     Nonetheless, Professor Bennett gave Dr. Rainwater a D in the course.

39.     The absolutely targeted nature of this malicious grading was evident the second time around, as Professor Bennett clearly took steps to prevent Dr. Rainwater from completing course requirements.

40.     On April 18, 2017, the class was scheduled to discuss an assignment in a mock boardroom exercise.  Dr. Rainwater arrived at class early, at the normally scheduled location.

41.     When the class start time passed without any other students arriving, Dr. Rainwater checked her email only to find that Professor Bennett had moved the class location not once, but twice, just a few hours earlier.

42.     However, when Dr. Rainwater went to find the class at each of the two other named locations, the class was not in either.  Without any information about the meeting location, and unable to otherwise find the class, Dr. Rainwater had no option but to head home.

43.     A classmate later texted her that the class was meeting in the Bird Medical Library, an entirely different location from those specified in Professor Bennett's emails, and Professor Bennett had said [Dr. Rainwater] "better get there if she wanted to pass the course."

44.     When Dr. Rainwater saw this text, an hour after it was sent, she let the classmate know she was on her way, but noted she lived 30 minutes from the library.

45.    The classmate let Professor Bennett know Dr. Rainwater would be there in 30 minutes, but just 20 minutes later, Professor Bennett ended class and dismissed the students.

46.    It was only after the class that Dr. Rainwater discovered that Professor Bennett had sent a third email to every student except for Dr. Rainwater, informing them that the class would be held in the Bird Library.

47.    Dr. Rainwater emailed Professor Bennett regarding the assignment and explaining the confusion regarding the class location and the fact that she had not been sent the email with the ultimate location.

48.    Dr. Rainwater also sought the support of her advisor regarding the situation. Unfortunately, her advisor told her there was nothing she could do, and could only recommend apologizing to Professor Bennett for missing class – an action Dr. Rainwater also took.

49.    Prior to this incident, Dr. Rainwater had attended all of her classes during the 2016-2017 school year, save for one class period in the fall.  Nonetheless, Professor Bennett's hostile response to this simple error – an error caused by Professor Bennett's own failure to inform Dr. Rainwater of the class location – was to tell Dr. Rainwater she would not be permitted to give her oral assignment because she "chose" not to attend class that day.

50.    Professor Bennett's hostility was not confined to this one incident.  In fact, Professor Bennett had previously sent hostile emails to Dr. Rainwater regarding her course work, often after Dr. Rainwater requested an accommodation.

51.    Further, while Professor Bennett posted assignment grades in the university system for other students throughout the semester, Professor Bennett failed to post any grades for Dr. Rainwater until she entered the final grade, preventing her from monitoring her progress.

52.     The culmination of this malicious targeting and hostility was that Dr. Rainwater received a D in professional communication.  Professor Bennett attributed the grade in large part to the mock boardroom exercise that Dr. Rainwater missed because Professor Bennett did not tell her of the class location change.

53.     Until that moment, Dr. Rainwater had been preparing to complete the MHA program.  She had the requisite GPA to graduate, had successfully completed the capstone course demonstrating all necessary skills for graduates of the program, and had only her ten-week internship and a single elective left to take.  She was scheduled to start her internship shortly after the semester ended.

54.     However, on May 18, 2017, just two days after final grades for the semester were due, she received notice from Dr. Johnson that she was being dismissed from the program as a result of her grade in Professor Bennett's class and her resulting below 3.0 GPA.

55.     Under the terms of the Academic Appeals Policy and Procedures, students who receive a failing grade may make an appeal related to an academic evaluation by providing a written statement to the instructor alleging a prejudiced or capricious evaluation within ten (10) University business days after the grade is made known to the student.

56.     Classes ended on May 9, 2017.  Dr. Rainwater received notice of her dismissal from the program on May 18, 2017, in a letter from Dr. David Johnson, citing Professor Bennett's grade as the basis.

57.     At best, even assuming Dr. Rainwater could have known about her grade on the last day of class, ten business days would have been May 23, 2017, three (3) business days after she received notice of dismissal.  In reality and in part because Professor Bennett failed to update her grades during the course, Dr. Rainwater learned of the grade much later.

10

58.     Dr. Rainwater was dismissed from the program prematurely without the opportunity to appeal the grade that allegedly served as the basis of the dismissal.

59.     However, Dr. Rainwater did appeal her dismissal within the 10 university business days provided by policy for appeals of a dismissal.

60.     Under the terms of the policy, a student dismissed from a program may file a written request for a hearing with the Senior Vice President and Provost.  The policy states, "[t]he sole basis for an appeal of an academic program-related decision is alleged prejudice or capriciousness in the dismissal."

61.     Dr. Rainwater's appeal alleged that her dismissal was for arbitrary and capricious reasons, and outlined the above concerns with Professor Bennett, as well as noted the failure to provide clear instruction as to academic probation requirements, the refusal to count a graded course in her GPA and the incongruity of the decision with the judgment of other faculty, including of the faculty leading her capstone course who judged her to possess all necessary knowledge, skills and abilities required to graduate.

62.     On June 23, 2017, the Senior Vice President and Provost, Dr. Jason Sanders, responded in writing that her "request [did] not meeting the criteria for a hearing in accordance with the Academic Appeals Policy of" OU.  No other information or explanation was provided.

///

///

///

## FIRST CAUSE OF ACTION

*VIOLATIONS OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C.*
*§ 12101, et seq., and SECTION 504 OF THE REHABILITATION ACT OF 1973,*
*29 U.S.C. § 701, et seq.*
**(*DISABILITY DISCRIMINATION*)**

**Against the Board of Regents for the University of Oklahoma and State of Oklahoma *ex rel.* University of Oklahoma and Defendants Sanders, Bennett, Johnson and Ibay in their official capacities**

63.     Each of the allegations set forth in paragraphs 1 through 62, inclusive, are hereby incorporated by this reference as if realleged fully herein.

64.     That Title II of the ADA provides, "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."   42 U.S.C. § 12132.   The RA provides, "No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...."   29 U.S.C. § 794(a).   Because the language of these two provisions is substantially similar, claims under both acts are generally analyzed together.

65.     That OU is subject to the mandate of the ADA and receives federal financial assistance, as defined by 29 U.S.C. § 794, including through receipt of federal student aid, and, as such, may not discriminate against a person because of her disabilities.

66.     That at all relevant times, Dr. Rainwater was a "qualified individual with a disability."   Dr. Rainwater suffered from a chronic and serious health condition, which substantially limited a number of major life activities including learning, working, concentrating, and performing a number of physical activities as a result of the severe pain, fatigue and effects of related medical treatment.   This condition required her to seek extensive medical treatment,

12

including surgery, which adversely affected her ability to attend classes and timely complete assignments, thereby affecting her ability to function in her role as a student at OU.  She was otherwise able to perform the essential functions for participation in OU's curriculum with or without accommodations.

67.     That Defendants discriminated against Dr. Rainwater on the basis of her disability through the following:

a.      Refusing to provide the requested accommodations for her disability, including extensions on assignments and adjustments to class attendance requirements.

b.      Failing to engage in the interactive process with Dr. Rainwater in order to identify and provide necessary and reasonable accommodations.

c.      Recommending she leave the program, at least temporarily, rather than provide her with accommodations.

d.      Failing to accept assignments turned in late due to Dr. Rainwater's incapacitation as a result of her disability or otherwise penalizing Dr. Rainwater for her disability and requests for accommodation through her grade.

e.      After Dr. Rainwater disclosed her condition, treating Dr. Rainwater's efforts to complete class and probation requirements with hostility, including ensuring that she would miss a critical presentation by failing to provide her with accurate information about the class location and refusing to count a class in which Dr. Rainwater earned an "A" towards her GPA.

f.      Failing to post Dr. Rainwater's grades during the course of the Communications class, despite posting grades for all other students.

g.      Dismissing Dr. Rainwater for the effects directly resulting from Professor Bennett and the MHA program's discrimination shortly after grades came out, preventing her from being able to appeal the grade underlying the dismissal and then refusing to provide a hearing for the dismissal decision though Dr. Rainwater submitted an appeal in accordance with OU policy.

68.      That each of these actions was targeted towards Dr. Rainwater alone, because of Professor Bennett and OU's hostility towards her health condition and request for accommodations, and their belief that she should leave the program because of her disability.

69.      That Defendants wrongly discriminated against Dr. Rainwater, all in violation of her rights pursuant to the ADA and the RA, inflicting mental and emotional distress, and causing further damage to her health, well-being, academic and professional careers, because she is disabled.

70.      That as a direct and proximate result of the unlawful discrimination against Dr. Rainwater in violation of the ADA and the RA by the Defendants, Dr. Rainwater has suffered and continues to suffer damages academically, financially, and emotionally in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

71.      That it has been necessary for Dr. Rainwater to obtain the services of an attorney to prosecute this action, and Dr. Rainwater is entitled to an award of attorney's fees and costs of suit incurred herein.

72.      That Dr. Rainwater is entitled to injunctive and declaratory relief to obtain readmission to OU's MHA program free from retaliation, and for an order forbidding all Defendants from further perpetuating negative acts against her professionally.

## SECOND CAUSE OF ACTION

### *CIVIL RIGHTS VIOLATIONS UNDER 42 U.S.C. § 1983*
### *(DENIAL OF SUBSTANTIVE DUE PROCESS)*

**Against the Board of Regents for the University of Oklahoma and State of Oklahoma *ex rel.* University of Oklahoma and Defendants Sanders, Bennett, Johnson and Ibay in their official capacities**

73.     Each of the allegations set forth in paragraphs 1 through 72, inclusive, are hereby incorporated by this reference as if realleged fully herein.

74.     That all persons residing in the United States are afforded the right to substantive due process through the Fourteenth Amendment of the United States Constitution.

75.     That the protections of the Substantive Due Process clause of the Fourteenth Amendment bar the government from taking arbitrary action that results in the deprivation of a person's interest without reasonable justification.

76.     That students in Oklahoma Universities have a property interest in continued enrollment and students are therefore entitled to due process under the Constitution.

77.     That a Court may override a postsecondary public university's academic decision where the school's actions were such a substantial departure from accepted academic norms as to demonstrate that they did not actually exercise professional judgment when stripping the student of the protected property interest.

78.     That when viewed against the background of Dr. Rainwater's career and academic history, Defendants' arbitrary and capricious dismissal of Dr. Rainwater following their failure to provide reasonable accommodations, based solely on Professor Bennett's arbitrary and capricious grading, was an extreme departure from academic norms and had no rational academic basis.

79.     That academic decisions based on discrimination, or the effects of discrimination, are by definition arbitrary and capricious.

80.     That by failing to provide accommodations, Dr. Rainwater's grades reflected the impact of OU and Professor Bennett's discrimination, not what her academic performance would have been had she received the accommodations to which she was entitled.

81.     That Professor Bennett's hostility and targeted efforts to sabotage Dr. Rainwater's academic career and continuation in the MHA program made any decision that relied on Professor Bennett's grading arbitrary and capricious.

82.     That, additionally, OU deviated from its own policy by dismissing Dr. Rainwater before she had an opportunity to appeal the grade on which the dismissal was based, depriving Dr. Rainwater of the benefits of the checks and balances built into OU's policies.

83.     That, finally, Dr. Sanders refused, without reason, to consider Dr. Rainwater's appeal of the dismissal despite the fact that her appeal met the required criteria under the policy. The arbitrary refusal to consider her appeal and provide her with the hearing to which she was entitled, without any basis, reflects a failure to exercise professional judgment.

84.     That as a result of Defendants' official policies, acts, omissions, and practices, Dr. Rainwater was improperly dismissed from the MHA program and deprived of due process.

85.     That as a result of Defendants' official policies, acts, omissions, and practices, Dr. Rainwater has suffered irreparable harm because she was deprived of her contractual rights to be free from arbitrary, capricious abuse perpetrated by state actors acting on behalf of the state.

86.     That as a proximate result of the illegal, arbitrary and capricious acts of Defendants, Dr. Rainwater has suffered and continues to suffer damages academically, financially, and emotionally.

87.     That Defendants' actions and omissions proximately caused Dr. Rainwater to suffer, and she continues to suffer damages, including humiliation, severe emotional distress, loss of professional reputation, and permanent professional damage.

88.     That the acts, conduct, and behavior of Defendants have denied Dr. Rainwater her substantive due process rights, by reason of which Dr. Rainwater is entitled to injunctive relief of immediate re-enrollment as a student in the MHA program.

89.     That it has been necessary for Dr. Rainwater to obtain the services of an attorney to prosecute this action, and she is entitled to an award of attorney's fees and costs of suit incurred herein.

## THIRD CAUSE OF ACTION

### CIVIL RIGHTS VIOLATIONS UNDER 42 U.S.C. § 1983
### (DENIAL OF SUBSTANTIVE DUE PROCESS)

**Against Defendants Bennett, Johnson and Sanders in their Individual Capacities**

90.     Each of the allegations set forth in paragraphs 1 through 89, inclusive, are hereby incorporated by this reference as if realleged fully herein.

91.     That Defendants Bennett, Johnson and Sanders, in their individual capacities (collectively, the "Individual Defendants"), intentionally violated Dr. Rainwater's constitutional rights under the Substantive Due Process clause of the Fourteenth Amendment.  Defendants knew that their actions in the conduct of perpetuating discrimination and intentionally denying Dr. Rainwater the benefits of the OU policies and curriculum, and then dismissing her based on the biased grades resulting from that conduct, without appeal, denied Dr. Rainwater her constitutional right to substantive due process and, therefore, exceeded the authority granted to them in their official capacities as representatives of OU and, thus, they are individually and personally liable for any damages incurred by Dr. Rainwater.

17

92.     That Defendant Bennett knowingly, arbitrarily and capriciously denied Dr. Rainwater any accommodations for her health condition and then proceeded to treat Dr. Rainwater with hostility, refusing to accept certain assignments, intentionally failing to tell Dr. Rainwater of a location change for a critical presentation, and failing to update Dr. Rainwater's grades during the semester, ultimately giving Dr. Rainwater a grade that did not reflect Dr. Rainwater's achievement but was instead designed to ensure that Dr. Rainwater would be dismissed from the program as Professor Bennett had originally advocated.

93.     That Defendant Johnson intentionally dismissed Dr. Rainwater on the basis of Professor Bennett's arbitrary and discriminatory grade in such a manner as to preclude Dr. Rainwater from being able to appeal the grade, thereby ratifying Professor Bennett's acts, ensuring that Professor Bennett's discriminatory and arbitrary conduct could not be challenged.

94.     That Defendant Sanders intentionally refused to consider Dr. Rainwater's appeal, though it met the criteria for an appeal under OU policy and raised questions about the arbitrary and capricious grading that was the basis for the dismissal.  In doing so, Dr. Sanders also ratified Professor Bennett's acts, ensuring that Professor Bennett's discriminatory and arbitrary conduct could not be challenged.

95.     That Defendants acted under color of law in violating the Fourteenth Amendment, as described herein in violation of 42 U.S.C. § 1983.

96.     That, as a result of Defendants' acts, omissions, and practices, Dr. Rainwater was improperly dismissed from the MHA program, despite clear evidence that she was meeting program expectations.

97.     That the Individual Defendants, under the color of law, violated Dr. Rainwater's right to substantive due process by exercising their power without reasonable justification.

98.     That as a result of the individual acts, omissions, and practices of the Individual Defendants, Dr. Rainwater has suffered irreparable harm because she was deprived of her contractual rights to be free from arbitrary, capricious abuse perpetrated by state actors acting on behalf of the state.

99.     That as a proximate result of the illegal, arbitrary and capricious acts of the Individual Defendants, Dr. Rainwater has suffered and continues to suffer damages academically, financially, and emotionally.

100.    That the actions and omissions of the Individual Defendants proximately caused Dr. Rainwater to suffer, and she continues to suffer, damages, including, humiliation, severe emotional distress, loss of professional reputation, and permanent professional damage.

101.    That the acts, conduct and behavior of each of the Individual Defendants in acting to deny Dr. Rainwater her substantive due process rights were performed knowingly, intentionally, oppressively, and maliciously, by reason of which Dr. Rainwater is entitled to compensatory and punitive damages against Defendants in their individual capacities in a sum in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00).

## FOURTH CAUSE OF ACTION

### *TORTIOUS INTERFERENCE WITH CONTRACT*
**Against Defendants Bennett, Johnson, and Sanders, individually**

102.    Each of the allegations set forth in paragraphs 1 through 101, inclusive, are hereby incorporated by this reference as if realleged fully herein.

103.    That courts in Oklahoma and the Tenth Circuit recognize a contractual relationship between students and universities.

104.    That Dr. Rainwater had a contract with OU by virtue of her enrollment, some of the terms of which are found in part in the OU Health Sciences Center Student Handbook ("Student Handbook") and bulletin.

105.    That Dr. Rainwater dutifully complied with the mandates of the contractual materials governing her relationship with OU.

106.    That the Student Handbook and bulletin clearly establishes that grades are intended to reflect a student's actual performance, not arbitrary and non-academic determinations, and that dismissals of a student will occur in only limited circumstances, such as a failure to meet academic standards.

107.    That Dr. Rainwater clearly met the MHA program's academic standards. Her grade in the capstone course clearly demonstrates her mastery and meeting of criteria.

108.    That, further, under the terms of the Academic Appeals Policy and Procedures, students who receive a failing grade may make an appeal related to an academic evaluation by providing a written statement to the instructor alleging a prejudiced or capricious evaluation within ten (10) University business days after the grade is made known to the student (OUHSC Academic Appeals Policy and Procedures, Appendix C § 4.16.2(1)).

109.    That classes ended on May 9, 2017.  Dr. Johnson dismissed Dr. Rainwater from the program on May 18, 2017.  Ten business days from the last day of class, the earliest Dr. Rainwater could have known her grade, would have been May 23, 2017, three (3) business days after she received notice of dismissal.  In reality, Dr. Rainwater received notice of the grade much later.

110.    That she was dismissed from the program prematurely and thereby denied the opportunity to appeal the grade that allegedly served as the basis of the dismissal.

111.    That Dr. Rainwater also was not permitted by Dr. Sanders to pursue the appeal of her dismissal, though it clearly met the requirements of the appeals policy.  Under the terms of the Academic Appeals Policy and Procedures, students who are dismissed from a program may request a hearing on the basis of an alleged prejudice or capriciousness in the dismissal by making a written request within ten (10) University business days after the student is notified of the dismissal (OUHSC Academic Appeals Policy and Procedures, Appendix C § 4.16.2(3)). There is no provision permitting the Senior Vice President and Provost to deny a hearing for an appeal that meets the specified criteria.

112.    That Dr. Rainwater received the notice of dismissal on May 18, 2017, and presented a written request to Dr. Sanders, Senior Vice President and Provost on June 1, 2017, with the explicit allegation that dismissal was based on an arbitrary and capricious reason.

113.    That Professor Bennett acted outside the scope of her employment by intentionally, maliciously and in bad faith interfering with Dr. Rainwater's contract with OU by subjecting Dr. Rainwater to ongoing hostility, disability discrimination, and efforts to oust her from the program unrelated to her academic performance, intentionally preventing her from participating in all class activities and issuing and concealing her arbitrary and failing grades, unrelated to Dr. Rainwater's performance or caused by Defendant Bennett's own actions.

114.    That Dr. Johnson acted outside the scope of his employment by intentionally, maliciously and in bad faith cooperating with Professor Bennett by then relying on her grades and dismissing Dr. Rainwater from the MHA program in a manner designed to prevent Dr. Rainwater from appealing her class grade, thereby tortuously interfering with and denying her the benefits of her contract with OU.

115.    That Dr. Sanders acted outside the scope of his employment by intentionally, maliciously and in bad faith cooperating with Professor Bennett and Dr. Johnson, including by refusing to consider Dr. Rainwater's appeal in contravention of her contract with OU without basis, thereby tortuously interfering with and denying her the benefits of her contract with OU.

116.    That as a direct and proximate result Defendants' actions, Dr. Rainwater was deprived of the benefits of her contract with OU, dismissed from the MHA program, and has suffered and continues to suffer irreparable harm, injury, and damages; including, but not limited to, monetary damages, time and resources, career opportunities and earning capacity, mental and emotional distress, anxiety and mental anguish, humiliation and embarrassment, and loss of personal and professional reputation, all in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00).

117.    That it has been necessary for Dr. Rainwater to obtain the services of an attorney to prosecute this action, and Dr. Rainwater is entitled to an award of attorney's fees and costs of suit incurred herein.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Dr. Rainwater demands a jury trial for all issues in this matter.

## RELIEF REQUESTED

WHEREFORE, Dr. Rainwater prays that this Honorable Court enter judgment in her favor, and against the Defendants:  (a) for Injunctive Relief to reinstate Dr. Rainwater as a student in good standing University of Oklahoma's Master's in Health Administration Program; (b) for compensatory damages from the individual Defendants in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) to be determined at trial; (c) for

punitive damages against the Individual Defendants in excess of SEVENTY-FIVE THOUSAND

DOLLARS ($75,000.00) to be determined at trial; (d) for interest; (e) together with the costs and

disbursements of this action and such other attorneys' fees, pursuant to 42 U.S.C. § 1988; and (d)

further relief as justice requires.

DATED this 26th day of April, 2019.

Respectfully Submitted,

**WIDDOWS LAW FIRM**

By_____/s/ R. Jack Freeman_____
R. JACK FREEMAN, OBA #3128
1861 East 71st Street
Tulsa, Oklahoma  74136
Telephone:  (918) 744-7440
Facsimile:  (918) 744-9358
Email:  jfreeman@widdowslaw.com


**THE BACH LAW FIRM, LLC**
JASON J. BACH, ESQ.
(*Pro Hac Vice Pending*)
Nevada Bar No. 7984
7881 W. Charleston Blvd., Suite 165
Las Vegas, Nevada 89117
Telephone: (702) 925-8787
Facsimile: (702) 925-8788
Email:  jbach@bachlawfirm.com
*Attorneys for Plaintiff*